**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE ABI JAOUDI AND AZAR | : | |
| TRADING CORP., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 91-6785 |
| | : | |
| CIGNA WORLDWIDE INS. CO., | : | |
| Defendant. | : | |

Diamond, J.                                                                 July 22, 2016

<u>**M E M O R A N D U M**</u>

CIGNA Worldwide Insurance Company asks me to hold a business and three individuals in contempt for defying this Court's: 1) 2001 Anti-Suit Injunction; and 2) discovery orders. Abi Jaoudi and Azar Trading Corporation—a Liberian company and Party Respondent—has not responded to CWW's Motion. Conceding their defiant conduct, non-Party Respondents Martin Kenney, Samuel Lohman, and Garrett Kelleher argue primarily that because they are foreign nationals or reside abroad, this Court has no jurisdiction over them, and that they are immune from suit because they acted in conjunction with Liberian officials. Remarkably, Lohman and Kelleher have repeatedly refused to provide any discovery in support of either contention. Kenney has provided only minimal discovery. It is nonetheless apparent that all Respondents have repeatedly thumbed their noses at the Courts of the United States. In defying this Court's Injunction and discovery orders, Respondents have submitted to this Court's jurisdiction and are liable in contempt.

### I.    Factual Findings

I make the following factual findings pursuant to Rule 52. Fed. R. Civ. P. 52; <u>Twelve John Does v. D.C.</u>, 855 F.2d 874, 877 (D.C. Cir. 1988) ("[R]ulings on contempt motions fall

within the requirements of Civil Procedure Rule 52(a).").  CWW has proven the following facts with clear and convincing evidence.

Although neither AJA nor Kelleher appeared at the contempt hearing in this matter, counsel for Lohman and Kenney conceded that no relevant facts are in dispute.  (Doc. No. 470, Tr. at 4-5 (Gary Miller [Kenney's Counsel]: "The facts set forth in your order in all material facts, we do not dispute."; Mark Gottlieb [Lohman's Counsel]: "We do not dispute the facts."); (Doc. No. 428 at 20 ("The relevant facts are not in dispute.").)  The record in this case spans some twenty-five years and is considerable.  Lohman and Kenney have made my review of that record even more difficult with their massive filings.  (Doc. Nos. 428, 429.)  In the interest of clarity, I will set forth only the most pertinent record facts.

*This Court's Judgment and Injunction*

A Liberian corporation, AJA purchased a general liability insurance policy in 1990 from CWW.  In 1991, AJA brought the instant action in this Court, seeking coverage for damage AJA's insured commercial properties sustained during the Liberian Civil War.  After a jury verdict for AJA, Judge O'Neill (to whom the matter was then assigned) entered a judgment non obstante verdicto in favor of CWW, ruling that the damage was subject to the insurance policy's war risk exclusion.  Younis Bros. & Co. v. CIGNA Worldwide Ins. Co., 899 F. Supp. 1385 (E.D. Pa. 1995).  The Third Circuit affirmed, and the Supreme Court denied certiorari.  Younis Bros. & Co. v. CIGNA Worldwide Ins. Co., 91 F.3d 13 (3d Cir. 1996), cert. denied, 519 U.S. 1077 (1997).  Having lost in the Courts of this country, AJA brought suit in Liberia and won a $66.5 million Judgment against CWW in 1998.  (Doc. Nos. 437, 438, Ex. 14.)

In 2001, Judge O'Neill granted CWW's request to enjoin AJA's efforts to enforce the Liberian Judgment, entering the following Injunction:

> Plaintiffs The Abi Jaoudi and Azar Trading Corp. and Younis Brothers & Co., Inc. are prohibited and enjoined from initiating, maintaining, continuing or taking any actions that conflict with, constitute an attack upon, or seek to nullify this Court's final order dated September 15, 1995, and the judgment entered pursuant thereto. Additionally, plaintiff The Abi Jaoudi and Azar Trading Corp. is prohibited and enjoined from taking any action to enforce in any jurisdiction the Liberian judgment against defendant [CWW] dated October 4, 2000.

Younis Bros. & Co. v. CWW Worldwide Ins. Co., 167 F. Supp. 2d 743, 744 (E.D. Pa. 2001).

*AJA Defies Judge O'Neill's Injunction*

No Party appealed or otherwise challenged the 2001 Injunction in this country. Rather, AJA began its efforts to enforce the Liberian Judgment by asking the Liberian courts to "clarify" its rights. (Doc. No. 428 at 9.) In April 2002, Judge Yussuf Kaba of the Liberian Civil Law Court deemed Judge O'Neill's Injunction unenforceable and reaffirmed the 2000 Liberian Judgment. Judge Kaba based this ruling in part on his determination that neither a judgment n.o.v. nor an anti-suit injunction is cognizable under Liberian law. (Id., Ex. B.) Judge Kaba further threatened contempt against any party who sought to prevent enforcement of the Liberian judgment. (Id.)

AJA then retained others to aid its efforts: 1) Respondent Martin Kenney, a dual Irish and Canadian citizen based in the British Virgin Islands who previously practiced as a foreign legal consultant in New York; and 2) Respondent Samuel Lohman, a United States citizen and a member of the Oregon bar with an office in Switzerland.

*Kenney's and Lohman's Contumacious Efforts*

In February 2005, Kenney and Lohman formed CCI, Ltd., an entity intended to "obtain access to a court of neutral jurisdiction to determine the validity of their claims"—namely, the enforceability of the Liberian Judgment. (Doc. Nos. 437, 438, Ex. 2 ¶ 14.) To bolster this initiative (and in return for CCI stock), AJA assigned CCI title to AJA's rights to receive

proceeds from the enforcement of the Liberian Judgment.  (Id. ¶ 16.)  CCI "provide[d] financial support" to efforts to enforce the Liberian Judgment and also cooperated with the so-called "G-22" (twenty-two Liberian businesses that had purchased CWW insurance policies and had brought similar coverage suits).  (Id. ¶¶ 13, 16.)  Kenney and Lohman represented CCI from at least as early as March 2006 to April 2007.  (Doc. No. 428 at 13; Doc. Nos. 437, 438, Exs. 2, 3.)

Lohman and Kenney sought outside financing.  (Id. ¶ 20.)  Kenney contacted Respondent Garrett Kelleher, an Irish property developer, and familiarized him with the potential investment and Judge O'Neill's Injunction.  (Doc. No. 437, 438, Ex. 11 at Interrog. 1(g) ("Mr. Kenney believes he sent Garrett background information prior to February 23, 2006, which included a reference to the No-Action/Anti-Suit Injunction together with other general information regarding the history of the case.").)  On February 23, 2006, Kelleher agreed to invest $2.85 million to pursue the Liberian Judgment.  (Id.; Doc. Nos. 437, 438, Ex. 1 at 15.)  In March 2006, Kelleher also became a CCI shareholder with a seat on its board—along with AJA and the G-22 (whose members collectively held a seat) and another, independent director.  (Id. at 1, 18.)  CCI shareholders, in turn, entered into a Shareholder Agreement allocating portions of any recovery on the Liberian Judgment.  (Id., Ex. 9.)

Kenney and Lohman also agreed to assist the enforcement effort by billing their time at a reduced hourly rate in exchange for a contingency interest in the litigation.  (Id. at 4 ("Supplementing CCI's capital base is the joint letter of engagement between Law Firm Lohman and Martin Kenney & Co, Solicitors . . . whereby the law firms have to date, placed $2,406,601.75 at risk.").)  In April and July 2006, Lohman issued letters to CWW on behalf of CCI and AJA, demanding payment on the Liberian Judgment.  (Id., Exs. 4, 5.)

*The Installation of a Receiver*

Acting on behalf of AJA and the G-22, Lohman and Kenney then sought the appointment of a Liberian Receiver to collect on debts that ACE Limited—an insurance company that had agreed to indemnify CWW for certain liabilities—owed to CWW's purported "Liberian [B]ranch." (<u>Id.</u>, Ex. 2 ¶¶ 20-21.) In April 2007, the Liberian Court appointed as Receiver Josie Senesie, Liberian Commissioner of Insurance. (<u>Id.</u> ¶ 21.) The next day, the Receiver retained Lohman and Kenney as counsel. (<u>Id.</u>; Ex. 3 ¶ 19; Ex. 9 ¶ 285; Ex. 18.) Acting on Lohman and Kenney's advice, the Receiver recognized the Liberian Judgment as "debts of the estate" and brought suit against ACE in the Cayman Islands, seeking to enforce the Judgment. (<u>Id.</u>, Ex. 19 at 12-13.) In February 2007, the Receiver entered into a Memorandum of Understanding with CCI to pursue the Liberian Judgment. (<u>Id.</u>, Ex. 9 ¶ 287; Ex. 10 ¶ 29.) Throughout, CCI prohibited the Receiver from settling any litigation for less than $28.88 million without the G-22's approval. (<u>Id.</u>, Ex. 1 ¶ 60.)

*The First Contempt Motion*

In November 2008, CWW filed a Motion for Contempt against AJA, the Receiver, Lohman, and others for conspiring to violate Judge O'Neill's Injunction. (Doc. No. 174.) CWW also sought through discovery to identify all those involved in efforts to enforce the Liberian Judgment. On December 1, 2008, this matter was reassigned to Judge Fullam. (Doc. No. 180.)

While the contempt motion was pending, Respondents continued to raise funds for their enforcement efforts. In December 2008, Kenney incorporated Echemus Investment Management Ltd. "to fund various cross-border asset recovery claims," including the Cayman action. (Doc. Nos. 437, 438, Ex. 2 ¶ 26.) Kenney personally invested funds in Echemus through a company that he owned. (<u>Id.</u>) Echemus would later enter into a funding agreement with CCI, stating that

5

Echemus had already provided $100,000 to CCI, and preserving its right to invest additional funding in exchange for CCI shares.  (Id., Ex. 28 §§ 2.2-2.3.)

In January 2009, Judge Fullam determined that this Court had personal jurisdiction over the Receiver and Lohman because they had been "aiding and abetting" the scheme to violate Judge O'Neill's Injunction.  Abi Jaoudi & Azar Trading Corp. v. CIGNA Worldwide Ins. Co., 2009 WL 80293, at *1-2 (E.D. Pa. Jan. 12, 2009), vacated and remanded, 391 F. App'x 173 (3d Cir. 2010).  Judge Fullam further determined that the Receiver and Lohman did not have immunity under the Foreign Sovereign Immunities Act because of the "commercial activity" exception.  Id. at 2; 28 U.S.C. § 1330.  Judge Fullam stayed the proceedings pending the Receiver's and Lohman's appeal.  While the appeal was pending, Senesie retired as Liberia's Insurance Commissioner, and Foday Sesay succeeded him as both Commissioner and court-appointed Receiver.  (Doc. No. 217.)

*Respondents' Refusal to Provide Discovery Following the Third Circuit's Remand*

Because Judge Fullam's jurisdictional ruling was not immediately appealable, the Third Circuit did not address it, reviewing only his denial of sovereign immunity under FSIA.  On August 20, 2010, the Court vacated Judge Fullam's Order and remanded to permit this Court to consider, whether in light of the "foreclose[ure]" of individual immunity in Samantar v. Yousef, 560 U.S. 305 (2010), Lohman and Senesie could still pursue "alternative paths" to immunity.  Abi Jaoudi, 391 F. App'x at 178.  The Court also remanded to allow the Parties to "engage in discovery, if necessary" and to make additional immunity arguments.  Id.  On April 20, 2011, this matter was reassigned to me.  (Doc. No. 238.)

Consistent with the Third Circuit's remand, I determined (as had Judge Fullam) that jurisdictional discovery was necessary.  (Doc. Nos. 239, 246, 272, 302.)  The persons and entities

disputing jurisdiction and urging sovereign immunity, however, made such discovery exceedingly difficult.  For instance, the Receivers refused to comply with at least two Orders requiring them participate in jurisdictional discovery, and admonishing that their failure to do so could result in the imposition of sanctions, including contempt.  (Doc. Nos. 220, 239, 246.)  Such disobedience prompted me to observe at an August 19, 2011 hearing that the Receivers are "unquestionably in violation of the Court's [May 10, 2011] discovery order." (Doc. No. 273, Tr. at 19.)  To date, the Receivers have not responded to CWW's October 25, 2010 jurisdictional discovery requests (including interrogatories, document requests, and deposition notices).  (Doc. Nos. 437, 438 at 63.)

Lohman also refused to be deposed or to produce any documents requested by CWW, arguing, *inter alia*, that the information sought was privileged under foreign law. At the August 19 hearing, Lohman's counsel agreed that Lohman would sit for an *in camera* deposition at which he could raise any privileges that he believed were applicable:

| | |
|---|---|
| The Court: | If your client has . . . no objection to submitting to the jurisdiction of this court, then presumably I can order him in here for a deposition over which I will preside, and he can invoke whatever privilege he wants, question by question. Correct? |
| Mr. Gottlieb: | That is correct and have never contended otherwise. |
| The Court: | So he's prepared to do that? |
| Mr. Gottlieb: | He has indicated that he is prepared to do that and was prepared to do that. |

(Doc. No. 273, Tr. at 13-14.)  By the hearing's conclusion, however, Mr. Gottlieb reneged, offering only to provide the documents at issue for *in camera* review.  (Id. at 15 (The Court: "Mr. Gottlieb, is there a reason you can't provide the documents to me *in camera* for my review, with an explanation as to why each document is privileged? . . . [Mr. Gottlieb]: And I do not

believe there [is] an impediment to that.").)  Accordingly, after the hearing, I ordered Lohman to "produce, for *in camera* review, **all** documents responsive to CIGNA's October 25, 2010 Requests for Production of Documents . . . [and to] provide a full and complete explanation detailing, document by document, the precise legal grounds for any claim that the document is not discoverable." (Doc. No. 272 ¶ 2.)

His counsel's assurances notwithstanding, Lohman failed to produce any documents and did not submit to deposition.  Accordingly, on March 21, 2012, I once again ordered Lohman to appear for deposition and bring all responsive discovery documents.  (Doc. No. 302.)  Lohman refused, again invoking foreign law and a theory of derivative sovereign immunity.  (Doc. No. 304.)  He acknowledged that I would likely "issue sanctions pursuant to Federal Rule of Civil Procedure 37 and, thereafter, find [him] in civil contempt for his alleged aiding and abetting a violation of this Court's April 10, 2001 'Anti-Suit Injunction.'" (Id. at 6.)

*The Revised Contempt Motion*

By this point, the Receivers, Lohman, and Kenney agreed to abandon the Cayman Islands action seeking indemnification from ACE for the Liberian Judgment.  (Doc. No. 241; Doc. Nos. 437, 438, Ex. 2 ¶ 34; Ex. 31 at 20.)  In February 2012, the Cayman Court had dismissed the Receiver's claims with prejudice, noting that it did "not consider that the Plaintiff [the "Liberian Branch" of CWW, acting through the Receiver] has taken the steps it should have taken to comply with what was in effect a promise to the EDPA" not to pursue its AJA claim.  (Doc. Nos. 437, 438, Ex. 31 at 21.)  Most recently, the Cayman Islands Grand Court determined that it had jurisdiction to join Kenney and CCI in a proceeding to determine liability for costs incurred in the Cayman action because they may have "instigated, controlled, and financed" the Receiver's efforts.  (Doc. Nos. 449, 450, 451.)  The Cayman Islands Court of Appeal dismissed Kenney's

and CCI's application for leave to appeal, and the Judicial Committee of the Privy Council denied their request for permission to appeal.  (Doc. Nos. 451, 471.)

On May 10, 2012, CWW amended its Contempt Motion to add additional Parties.  (Doc. No. 307.)  In light of CWW's continuing discovery efforts, I determined that the Motion was not ripe for decision and denied it without prejudice.  (Doc. No. 360.)

Over the next two years, CWW attempted to take jurisdictional discovery pursuant to my Order.  Several third parties cooperated with CWW's efforts.  (Doc. Nos. 437, 438, Ex. 11 (Interrogatory Responses from James Little, Echemus's senior executive); Ex. 13 (Kenney's Interrogatory Responses); Ex. 35 (deposition of Kirk Huddles, a former consultant to Echemus); Ex. 36 (deposition of Little); Ex. 37 (Little's document production).)  By contrast, Lohman provided only a self-serving affidavit; he refused to provide any discovery and refused to submit to deposition.  (Id., Ex. 3; Ex. 48.)  Kenney, too, provided interrogatory responses that are, at best, incomplete, as well as his own self-serving declaration.  (Id., Ex. 2; Ex. 13.)

Finally, in August 2014, CWW learned that Kelleher had made a $2.85 million investment in CCI, representing the great bulk of the funding for the Cayman action.  (Id., Ex. 11 (Interrog. No. 1(d)); Ex. 12 (Interrog. No. 1(e)); Ex. 13).)  On November 12, 2014, CWW served Kelleher personally in Ireland with contempt papers.  (Doc. Nos. 437, 438 at 20.)  To date, Kelleher has not responded to CWW's discovery requests.  (Id.)

*The Instant Motion*

On February 10, 2015, CWW filed a new Motion to hold AJA, Lohman, Kenney, and Kelleher in civil contempt for their violation of the 2001 Injunction.  (Doc. Nos. 419, 422.)  CWW further charged that Lohman is in contempt of my discovery orders of May 10, 2011, May 31, 2011, August 19, 2011, and March 21, 2012.  (Id.; Doc. Nos. 239, 246, 272, 302.)  On March

24, 2015, Lohman and Kenney filed briefs in opposition to the Motion for Contempt.  (Doc. Nos. 428, 429.)  On March 24, 2015, Respondent Kelleher, proceeding *pro se*, opposed the Motion, filing a two-page memorandum with an equally short declaration.  (Doc. No. 432.)

On April 2, 2015, CWW filed the instant Amended Motion for Contempt.  (Doc. Nos. 437, 438.)  Accordingly, on April 7, 2015, I denied CWW's February 10 Motion as moot.  (Doc. No. 439.)  On April 14, 2015, CWW submitted a Memorandum in further Support of its Motion for Contempt.  (Doc. No. 441.)  Respondent Kenney filed a Surreply on April 22, 2015.  (Doc. No. 448.)  On November 5, 2015, after preliminarily ruling that this Court had both personal and subject matter jurisdiction, I ordered that Respondents appear for a show cause hearing to address why they should not be held in contempt for violating Judge O'Neill's Injunction.  (Doc. No. 456.)  I further ordered Lohman to show cause as to why he should not be held in contempt for defying my discovery orders.  (Id.)

On January 26, 2016, I held a hearing at which Counsel for Lohman and Kenney appeared (as did CWW and its Counsel).  (Doc. No. 470, Tr.)  Although CWW had assured the Court and Respondents that it would not contend that Respondents' appearance waived any jurisdictional defense, none of the individual Respondents—all of whom reside abroad—attended the hearing.  (Doc. No. 462, 463, 465.)  Despite their awareness of these proceedings, AJA nor Kelleher has chosen not to appear through counsel or otherwise.

For the reasons that follow, I will hold Respondents AJA, Lohman, Kenney, and Kelleher in contempt of the 2001 Injunction.  I will further hold Lohman in contempt for violating my discovery orders.

## II.     Legal Standards

*Contempt*

Courts have inherent contempt authority "necessary to the exercise of all others."  Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 831 (1994); United States v. Harris, 582 F.3d 512, 514 (3d Cir. 2009) ("It has long been recognized that courts possess the inherent authority to hold persons in contempt.").  The moving party must prove by clear and convincing evidence that "(1) a valid court order existed, (2) the [respondent] had knowledge of the order, and (3) the [respondent] disobeyed the order."  Marshak v. Treadwell, 595 F.3d 478, 485 (3d Cir. 2009).   "[A]mbiguities must be resolved in favor of the party charged with contempt."   John T. v. Del. Cnty. Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003). "[W]illfulness is not a necessary element of civil contempt," so "good faith is not a defense." Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994) (internal quotation marks omitted); see McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949) ("An act does not cease to be a violation . . . of a decree merely because it may have been done innocently.").

Civil contempt sanctions serve two purposes: to coerce the contemnor into complying with the court's order, and to compensate the moving party for losses caused by the disobedience.  McDonald's Corp. v. Victory Inv., 727 F.2d 82, 87 (3d Cir. 1984); see also Bagwell, 512 U.S. at 827 ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience.").  Civil contempt is intended to coerce compliance; criminal contempt is principally punitive. See Bagwell, 512 U.S. at 828 ("[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also

is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order.").

*Failure to Provide Discovery*

Because Lohman, Kelleher, and AJA have refused all attempts to take discovery into their jurisdictional, immunity, and related defenses, any uncertainties or ambiguities in the factual record will be construed against them.  See 8B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2281 (3d ed.) ("Under Rule 37 . . . any party or person who seeks to evade or thwart full and candid discovery incurs the risk of serious consequences, which may involve imprisonment for contempt of court, an order that designated facts be taken to be established, [and] an order refusing the delinquent party the right to support or oppose designated claims or defenses."); Chevron Corp. v. Donziger, 296 F.R.D. 168, 223 (S.D.N.Y. 2013) ("[T]he Court in its discretion may infer from defendants' failure to produce documents in the possession of their [Ecuadorian] attorneys and agents that the evidence . . . would have been unfavorable to them.").

### III.   Discussion

CWW asks me to hold Respondents in civil contempt because of their repeated violations of Judge O'Neill's Order, including, *inter alia*: 1) representing AJA in its efforts to enforce the Liberian judgment; 2) brokering the sale of an enjoined claim; and 3) organizing and funding efforts to purchase an enjoined claim.  (Doc. Nos. 437, 438 at 36-52.)  Respondents acknowledge that they engaged in this conduct and even recognize the likely resulting consequences.  (Doc. No. 470, Tr. at 9 (Mr. Miller: "If that order were to apply to [Kenney], I think his conduct would be construed as violating the order."); id. at 13 (The Court: "You have said more or less that he conspired to violate an order of this Court. Why doesn't that give me jurisdiction over him? . . .

12

[Mr. Miller]: Again, it goes to characterization, I suppose.").)  Respondents urge that CWW has no remedy for their contumacious conduct because this Court—whose jurisdiction Respondent AJA invoked when initially seeking relief—lacks personal and subject matter jurisdiction. Respondents also argue that common law sovereign immunity precludes a contempt citation. For the reasons that follow and for those discussed in my November 5, 2015 Preliminary Order, I disagree.

### 1.  *This Court Has Personal Jurisdiction Over All Respondents*

The individual Respondents make jurisdictional arguments that are as confused as they are confusing.  They apparently contend that this Court is without personal jurisdiction because they took their challenged actions outside this state—indeed, outside this country.  (Doc. No. 428 at 27; Doc. No. 429 at 16.)   Kenney and Kelleher add that any exercise of this Court's jurisdiction over them, as foreign nationals, would violate due process.  (Id.; Doc. No. 432 at 2.) Finally, Lohman argues that this Court is without jurisdiction because he was never properly served.  (Doc. No. 429 at 7-8.)  Because most of these arguments could apply to all Respondents, I will discuss this Court's jurisdiction over those Respondents as well.

*Jurisdiction Over AJA as an Enjoined Party*

Having originally invoked this Court's jurisdiction and as the Party against whom Judge O'Neill entered the Injunction, AJA remains subject to this Court's personal jurisdiction in this contempt proceeding.  Fed. R. Civ. P. 65(d); Gregory v. Depte, 896 F.2d 31, 40 (3d Cir. 1990) ("Proceedings for civil contempt are . . . instituted and tried as a part of the main cause."); Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO, 545 F.2d 1336, 1343-44 (3d Cir. 1976) ("Civil contempt proceedings are . . . part of the underlying action.").

*Jurisdiction Over Aiders and Abettors*

Injunctions apply not only to named parties, but also to their "officers, agents, servants, employees, and attorneys" and all "other persons who are in active concert or participation" with those individuals.  Fed. R. Civ. P. 65(d)(2); <u>Marshak</u>, 595 F.3d at 486 ("Courts . . . have admitted a significant exception to the general maxim that only parties and their privies may be bound by an injunction."); <u>Roe v. Operation Rescue</u>, 54 F.3d 133, 140 (3d Cir. 1995) ("[I]ndividuals, who are neither parties to a proceeding nor named in the court order at issue, may nonetheless be subject to the court's contempt powers.").

A district court exercises personal jurisdiction according to the law of the forum state. <u>See</u> Fed. R. Civ. P. 4(k)(1).  Pennsylvania's long arm-statute permits a court to exercise jurisdiction to the limits of due process.  42 Pa. Cons. Stat. Ann. § 5322(b); <u>O'Connor v. Sandy Lane Hotel Co.</u>, 496 F.3d 312, 316 (3d Cir. 2007).  Traditionally, to comport with due process, the person over whom jurisdiction is exercised must have minimum contacts with the forum state such that maintaining the suit does not "offend traditional notions of fair play and substantial justice."  <u>Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement</u>, 326 U.S. 310, 316 (1945).  In conducting the fair play and substantial justice analysis, courts typically examine whether extending jurisdiction would be "reasonable."  <u>See</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980).

Recently, courts have held that a non-party may be held in contempt for knowingly aiding and abetting the violation of an injunction, even where the non-party otherwise lacks contacts with the forum state.  <u>See, e.g.</u>, <u>Waffenschmidt v. MacKay</u>, 763 F.2d 711, 718 (5th Cir. 1985).  Several Circuits have endorsed this so-called "super contacts" theory of personal jurisdiction with respect to domestic non-party aiders and abettors.  <u>Id.</u>; <u>Alderwoods Grp., Inc. v.</u>

Garcia, 682 F.3d 958, 971 (11th Cir. 2012) ("[C]ourts that have considered the issue generally agree that th[e] sanction power extends to a person outside the territorial limits of the court that issued the injunctive order, provided that the person had actual notice of the order and acted in concert with the party explicitly enjoined."); ClearOne Commc'ns, Inc. v. Bowers, 651 F.3d 1200, 1214-15 (10th Cir. 2011); S.E.C. v. Homa, 514 F.3d 661, 675 (7th Cir. 2008); see also Eli Lilly & Co. v. Gottstein, 617 F.3d 186, 195 (2d Cir. 2010).

Under the "super contacts" theory, due process is satisfied if the non-party knowingly acted in concert to violate an injunction with a party explicitly bound by the injunction. See, e.g., Waffenschmidt, 763 F.2d at 721 ("A finding . . . that a nonparty has aided a party in knowingly violating an injunction satisfies due process. . . . Haling a person into court only upon finding that the nonparty has aided in knowingly violating an injunction fulfills traditional notions of fair play and substantial justice."). Respondents argue that the theory "improperly melds the personal-jurisdiction issue into one that depends on the outcome of the case." (Doc. No. 428 at 30 n.9; Doc. No. 429 at 15.) I do not agree.

The super-contacts theory is of a piece with the well-established rule that a court has personal jurisdiction over any individual who "undertakes activity designed to have a purpose and effect in the forum." See Homa, 514 F.3d at 675 (citing Calder v. Jones, 465 U.S. 783, 788-89 (1984)). An individual's knowing attempt to "frustrate[e] the district court's . . . order"—a distinct and palpable effect within the forum—thus provides the requisite hook permitting the court to exercise personal jurisdiction. Id.; see also Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 137 (2d Cir. 2014) ("[I]ntentionally violating an . . . injunction is conduct 'designed to have purpose and effect in the forum," and . . . the authority to force compliance 'is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of

due process.'" (citing <u>Waffenschmidt</u>, 763 F.2d at 716)).  Accordingly, Respondents' contentions

notwithstanding, the super-contacts theory does not conflate the questions of personal

jurisdiction and contempt liability.  Rather, the court must first resolve the threshold

jurisdictional questions of: 1) whether a respondent, acting in concert with a bound party, took

knowing action to violate the injunction, thus having an effect within the subject forum; and 2)

whether exercising jurisdiction over him or her would be constitutional.  Only then may it turn to

the question of whether and to what extent the respondent is in contempt of the subject order.  It

is to the initial inquiries that I now turn.

*Jurisdiction Over the Individual Respondents*

As I have discussed, it is undisputed that Respondents, acting in concert with AJA over

the course of many years and with knowledge of this Court's Anti-Suit Injunction, engaged in a

sophisticated and deliberate effort to defy that Injunction by seeking to enforce the Liberian

Judgment.  That conduct plainly had effects in this state.  <u>See</u> <u>Homa</u>, 514 F.3d at 675.

Accordingly, Respondents have contacts with this District more than warranting this Court's

exercise of jurisdiction over them.

As I have discussed, even under the super-contacts theory, the exercise of jurisdiction

must be reasonable.  In assessing reasonableness, courts consider five factors:

> 1) [T]he burden on the defendant; 2) the interests of the forum State; 3) the
> plaintiff's interest in obtaining relief; 4) the international judicial system's interest
> in obtaining the most efficient resolution of controversies; and 5) the shared
> interest of the nations in furthering fundamental substantive social policies.

<u>See</u> <u>Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.</u>, 480 U.S. 102, 115 (1987); <u>see</u>

<u>also</u> <u>Gucci Am., Inc. v. Weixing Li</u>, 135 F. Supp. 3d 87, 99 (S.D.N.Y. 2015).  These

considerations—which "sometimes serve to establish the reasonableness of jurisdiction upon a

lesser showing of minimum contacts than would otherwise be required"—confirm the

reasonableness of requiring Respondents to litigate here.  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 477 (1985).

Although requiring individual Respondents to litigate in Pennsylvania may be burdensome, it is no more burdensome than litigating in Liberia or the Cayman Islands, countries where no individual Respondent resides.  Moreover, as I have discussed, this Court has a considerable interest in ensuring the enforceability of its own Judgments.  <u>Gucci Am., Inc.</u>, 135 F. Supp. 3d at 99 ("With respect to the forum's interest in adjudicating the dispute, courts do not "compare the interests of the sovereigns" but rather "determine whether the forum state has an interest.").  Next, CWW has an obvious and significant interest in obtaining relief from Respondents' outrageous conduct.  The international judicial system's interest in efficient resolution of this controversy would also benefit from having this Court, which AJA chose twenty-five years ago to decide this dispute, decide CWW's Motion.  <u>See id.</u> ("With respect to the international judicial system's interest in obtaining the most efficient resolution to the controversy, the Court's retention of jurisdiction over this action would undoubtedly provide the fastest and most practical means of resolving this dispute. The Court is already intimately familiar with the parties, facts, and legal issues.").  Finally, the "shared interests of nations" certainly favors the ability of each nation's courts to enforce and police its own judgments.  <u>See</u> Restatement (Third) of Foreign Relations Law § 482 (1987) (a U.S. Court is entitled to decline to recognize a foreign court's judgment if, *inter alia*, "the judgment conflicts with another final judgment that is entitled to recognition").

*Jurisdiction Over Foreign Nationals for Foreign Conduct*

Respondents argue that this Court lacks personal jurisdiction because the super-contacts theory does not extend to foreign nationals.  (Doc. No. 428 at 1-2, 20-23; Doc. No. 429 at 11; Doc. No. 432 at 2.)  I do not agree.

Respondents have offered no principled reason why they should be treated any differently than domestic citizens who knowingly violate this Court's orders.  Rather, Respondents seek to distort jurisdictional analysis to focus exclusively on nationality and not on the effects a respondent's actions have within the subject forum (the touchstone of the personal jurisdiction inquiry).  See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884  (2011) ("The [personal jurisdiction] question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."); see generally Julia K. Schwartz, Comment, "Super Contacts": Invoking Aiding-and-Abetting Jurisdiction to Hold Foreign Nonparties in Contempt of Court, 80 U. Chi. L. Rev. 1961, 1979 (2013) (arguing that super contacts justify the exercise of personal jurisdiction "across international borders" when Rule 65(d) has been satisfied).

Indeed, insulating Kenney and Kelleher from this Court's jurisdiction simply because they are foreign citizens—and so ignoring their deliberate and extensive misconduct in support of AJA (which originally invoked this Court's jurisdiction)—would impermissibly render the 2001 Injunction a nullity.  Cf. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911) ("If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.").

18

Although the Third Circuit has not explicitly addressed whether, under the super-contacts theory, personal jurisdiction extends to foreign non-parties, federal courts have held foreign non-parties in contempt when they knowingly conspired with bound parties to violate an injunction. See, e.g., Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 649 (2d Cir. 2004) (upholding contempt citation against Brazilian non-party for violation of anti-suit injunction); Liquid Glass Enters., Inc. v. Liquid Glass Prods. Int'l, Inc., 1991 WL 286953 at *6 (E.D. Pa. Oct. 8, 1991) (holding in contempt a non-party Japanese corporation for disobeying court's injunction), aff'd, 961 F.2d 1567 (3d Cir. 1992); cf. Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y, 774 F.3d 935, 957 (9th Cir. 2014) (holding in contempt a U.S. entity for aiding and abetting foreign non-parties in violating injunction); M & C Corp. v. Erwin Behr GmbH & Co., KG, 508 F. App'x 498, 500 (6th Cir. 2012) (foreign non-parties waived personal jurisdiction defense by entering appearance).  The rationale underlying these decisions is simple and compelling: there is nothing unfair about conferring a court's jurisdiction over any individual who conspires with a bound party to violate that court's injunction.  Indeed, Rule 65 would be profoundly weakened if federal injunctions could be violated with impunity by foreign nationals.

Relying on Reebok Int'l Ltd. v. McLaughlin, Respondents argue that I am compelled to reject this considerable authority.  49 F.3d 1387, 1392 (9th Cir. 1995); (Doc. No. 428 at 20-23).  I do not agree.

In Reebok, the plaintiff sought to hold a Luxembourg Bank in contempt for violating the district court's temporary restraining order freezing the assets of a Bank client who had allegedly violated the Lanham Act.  Recognizing that Waffenschmidt's holding as "sound, even necessary," the Ninth Circuit nonetheless declined to extend Waffenschmidt "across the

Atlantic," arguing that doing so would subject the bank to conflicting legal demands.  Id.  The Circuit emphasized that a Luxembourg Court had ruled that the American TRO did not affect the standard legal obligation of the Bank—which had no relevant contacts in the U.S.—to release funds to its depositors under Luxembourg law.  Id.; see also Gucci Am., Inc., 768 F.3d at 126 (remanding to the district court to determine whether it had specific personal jurisdiction to issue an asset freeze injunction).

The circumstances here are quite different.  In its initial coverage action, AJA invoked this Court's jurisdiction, litigated its claims before Judge O'Neill, the Third Circuit, and petitioned the Supreme Court for review.  (Doc. No. 470, Tr. at 34 (Mr. Hawthorne: "This began with a Liberian litigant who came to the United States, sought the justice of the U.S. courts, submitted [itself] to the jurisdiction of the U.S. courts, and took the U.S. court through a long trial, a long opinion, availed themselves of the Third Circuit and the opportunity to seek cert for the Supreme Court.").)  Only then did AJA pursue the Liberian Judgment, solely to violate the valid U.S. Judgment it had sought and obtained.  (Id. at 22 (Mr. Gottlieb: "[AJA] . . . through its proprietors went to Liberian court, sought, you know, some type of redress.").)  It was then that AJA recruited Respondents to assist in those efforts.  (Id. at 34 (Mr. Hawthorne: "[W]hen things went the other way, they just ignored the opinion and then they ignored the court's order.").)

Insofar as the Liberian and American Judgments conflict, this is the result of Respondents' defiance of Judge O'Neill's Injunction (by which they were "prohibited and enjoined from initiating, maintaining, continuing or taking on **any actions that conflict with** . . . this Court's final order . . . .").  Younis Bros., 167 F. Supp. 2d at 744 (emphasis added).

The situation here is thus distinguishable from that in Reebok.  The Luxembourg bank in Reebok was independently obligated under Luxembourg law to make its customers' funds

available to them, regardless of an American freeze order.  The <u>Reebok</u> Court's holding that jurisdiction should not extend to a non-party who "has simply behaved as any rational law-abiding person would" is thus inapplicable here, where Respondents have indisputably acted in bad faith.  49 F.3d at 1394.

Finally, Respondents argue that extending personal jurisdiction to them would violate the presumption against the extraterritorial application of U.S. laws.  (Doc. No. 428 at 27-29); <u>Kiobel v. Royal Dutch Co.</u>, 133 S. Ct. 1659, 1664 (2013); <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746, 763 (2014) (considering extraterritoriality when a court purports to exercise only general personal jurisdiction).  This reliance on a canon of statutory construction is misplaced because the Court's exercise of jurisdiction over Respondents is inherent. <u>Bagwell</u>, 512 U.S. at 831; <u>RJR Nabisco, Inc. v. European Cmty.</u>, 136 S. Ct. 2090, 2100 (2016) (presumption against extraterritoriality is a statutory construction canon).  To the extent the presumption limits U.S. statutory law, it does not and cannot so limit the federal courts' inherent power to enforce their judgments.  <u>See</u> <u>Waffenschmidt</u>, 763 F.2d at 722 ("The manifest need for a court to protect and enforce its own judgments is beyond doubt. The loss of such power would severely impair the integrity and authority of our judicial system.").

Numerous courts—including the Third Circuit—have rejected the suggestion that individuals (foreign or domestic) may violate American law with impunity simply because their acts occurred outside the United States.  <u>See</u> <u>Republic of Phil. v. Westinghouse Elec. Corp.</u>, 43 F.3d 65, 76 (3d Cir. 1994) ("[A] district court ha[s] the power to address the retaliatory conduct notwithstanding that it transpired on foreign soil half a world away."); <u>cf.</u> <u>Air-Products & Chemicals, Inc. v. Inter-Chem., Ltd.</u>, 2005 WL 196543, at *3 (E.D. Pa. Jan. 27, 2005) ("Nowhere in its Order does the Court limit the geographic area in which Defendants are

21

enjoined to within the United States . . . . It is therefore proper for this Court to ensure that Defendants are in compliance with its Order both within and without the borders of the United States."); United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985) ("The contumacious conduct may be punished in the district where the order was issued whether or not the acts occurred elsewhere, the effects of the acts fell elsewhere or the evidence thereof is located elsewhere.").

Similarly, the federal courts have the authority to sanction foreign citizens acting abroad. See Westinghouse Elec. Corp., 43 F3d. at 75 (sanctioning a foreign sovereign for intimidating witnesses because "[t]he Republic's actions, although taken in a foreign country, undeniably had effects in the United States"); Franklin Mint Corp. v. Franklin Mint, Ltd., 360 F. Supp. 478, 482 (E.D. Pa. 1973) (court's contempt power extended to British entity who violated U.S. injunction in England because "[i]t is settled law . . . that any state may impose liabilities [including civil contempt], even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends." (citations omitted)); cf. Alderwoods Grp., 682 F.3d at 972 ("The court's power to enjoin and to sanction extends to the whole world, to any person who comes into contact with the res."). To the extent that these Courts sanctioned these foreign parties, they necessarily first found personal jurisdiction.

Moreover, as I have discussed, unlike Kiobel, where the Court addressed conduct occurring exclusively outside the United States, Respondents' conduct here has a distinct nexus to this jurisdiction, where AJA (with which individual Respondents conspired) initiated this litigation, where CWW is headquartered, and where Judge O'Neill issued the 2001 Anti-Suit Injunction.

In sum, Respondents have failed to show why their nationality alone precludes this Court's exercise of personal jurisdiction over them.

*Jurisdiction Over Lohman as a United States Citizen*

United States citizens may not avoid compliance with an injunction merely because they act abroad.  See Homa, 514 F.3d at 675 ("As citizens of the United States, [Respondents] were required, once they had adequate notice, to obey the order of a United States court directed at them and their activities.").  Lohman, a United States citizen and an "active" member of the Oregon bar, was thus required to comply with the Anti-Suit Injunction regardless of where his conduct occurred.

*Respondents Did Not Act in Good Faith*

Individual Respondents argue that this Court may not exercise personal jurisdiction because they had a good faith belief that the Anti-Suit Injunction did not apply to them.  (Doc. No. 428 at 26 ("Exercising personal jurisdiction over Kenney would violate due process, because Kenney had a good faith belief that he was not violating the 2001 U.S. Injunction."); Doc. No. 429 at 10 n.4; Doc. No 432 at 2-3.)  I do not agree.

As I discuss below (and as I have found), Respondents knowingly acted in concert with AJA to violate the 2001 Injunction—a fact they conceded during the January 26, 2016 contempt hearing.  That knowing violation confers this Court's personal jurisdiction over them irrespective of any unsupported allegations of good faith.  Waffenschmidt, 763 F.2d at 711; cf. Reich v. Sea Sprite Boat Co., 50 F.3d 413, 415 (7th Cir. 1995) (belief that an Injunction is "invalid," "ineffectual," or "too vague" does excuse contempt).

*Service Was Proper*

For the reasons I discussed in my Preliminary Order, the record also establishes that Respondents were properly served.  (Doc. No. 456 at 11.)  Assuming, *arguendo*, that service was improper, this was cured by providing Respondents with an opportunity to be heard before I

made any contempt finding.  <u>See</u> 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2956 (3d ed.) (in a contempt proceeding, "the amenities of original process need not be followed"); <u>NML Capital, Ltd. v. Republic of Arg.</u>, 727 F.3d 230, 243 (2d Cir. 2013) ("[Q]uestions of personal jurisdiction . . . are premature" until the non-parties "are summoned to answer for assisting in a violation of a district court's injunction." (citations and quotations omitted)); <u>Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.</u>, 154 F.3d 1345, 1355 (Fed. Cir. 1998) ("formal service [on a non-party] is not required in a contempt proceeding" but instead requiring "adequate notice and an opportunity to be heard").

*There Is Personal Jurisdiction Over the Individual Respondents*

These many considerations compel me to conclude that this Court has specific personal jurisdiction over Respondents and that the exercise of such jurisdiction would not offend due process.

### 2.    *Comity*

Respondents belatedly challenge the propriety of Judge O'Neill's 2001 Anti-Suit Injunction: "[I]nternational-rapport concerns are also important to the question of whether jurisdiction exists at all." (Doc. No. 428 at 29, 50-54; Doc. No. 429 at 21.)  Such an argument is more appropriately addressed, however, as a matter of comity, not jurisdiction.  (Doc. No. 428 at 27); <u>see</u> <u>Gucci Am., Inc.</u>, 135 F. Supp. 3d at 99 ("Although [non-party Bank of China] asks the Court to consider the fact that granting [Plaintiff's] motion would force BOC to violate Chinese law, BOC cites to no other courts that have considered such arguments in the context of assessing the reasonableness of an exercise of personal jurisdiction, as opposed to a separate and subsequent comity analysis, and the Court declines to be the first.").

I will not revisit the propriety of the 2001 Anti-Suit Injunction.  As Judge O'Neill explained at length, the Third Circuit has ruled that Respondents' conduct is the kind to which an injunction is appropriately directed.  See Younis Bros. & Co., 167 F. Supp. 2d at 746; see also Stonington Partners v. Lernout & Hauspie Speech Prod. N.V., 310 F.3d 118, 125-27 (3d Cir. 2002), as amended (Nov. 12, 2002); Westinghouse Elec. Corp., 43 F.3d at 75 (injunctions that "simply enjoin[] private litigants from pursuing parallel litigation in foreign jurisdictions" satisfy comity and collecting cases).  As the Circuit has explained, "courts may enter an anti-suit injunction on the rare occasions when needed to 'protect jurisdiction or an important public policy,'" such as when "foreign defendants initiate[] the foreign proceeding for the 'sole purpose of terminating the United States claim.'"  Stonington Partners, 310 F.3d at 127 (citing Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 915 (D.C. Cir. 1984)).

Respondents' belated comity concerns thus must yield to this Court's considerable interest in protecting "the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation."   Laker Airways, 731 F.2d at 928; see also Westinghouse Elec. Corp., 43 F.3d at 75 ("Comity cannot be the source of a disability that *prevents* a district court from having the power to address wrongdoing that impacts a domestic court.").  Because Judge O'Neill correctly determined that efforts to enforce the Liberian Judgment threatened this Court's Judgment, he properly issued the Anti-Suit Injunction.

Respondents also urge me to deny the Instant Motion because complying with the Anti-Suit Injunction would violate their purported obligations under Liberian law.  (Doc. No. 428 at 53; Doc. No. 429 at 21.)   As I have already suggested, this argument is offensive, given Respondents' own efforts to manufacture these so-called comity concerns.  See NML Capital, Ltd. v. Republic of Arg., 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[C]omity is a

two-way street . . . . By observing the Injunction, Citibank asserts that it risks sanction in Argentina. However, if Citibank processes payments on exchange bonds, it violates the Injunction issued by this court . . . . But if Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded. Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them.").  Comity thus does not preclude the granting of relief to CWW.

### 3.  *Respondents Have Acted in Contempt*

Having concluded that this Court may exercise personal jurisdiction over Respondents, I must also address whether CWW has shown, by clear and convincing evidence, that Respondents acted in contempt.  Marshak, 595 F.3d at 485; see also Homa, 514 F.3d at 675-76 ("[H]aving determined that the district court correctly held that it had in personam jurisdiction over [the respondents], we next address whether the district court correctly determined that the receiver had proved contempt by clear and convincing evidence.").  I have made extensive factual findings respecting the actions AJA, Lohman, Kenney, and Kelleher took to violate the Injunction.  Accordingly, I will only summarize here the undisputed facts proving, by clear and convincing evidence, that individual Respondents acted in concert with AJA knowingly to violate the Injunction.

As Lohman's counsel acknowledged at the January 26 hearing, the conduct at issue here was "not . . . just some type of slight of hand."  (Doc. No. 470, Tr. at 29.)   Rather, Lohman admits that he knew of the Injunction when he began representing AJA in its efforts to enforce the Liberian Judgment.  (Doc. No. 429 at 4 ("Mr. Lohman was retained because of his experience in dealing with multi-jurisdictional proceedings, which were necessary here because

of the . . . complex interplay between competing judgments and injunctions from a United States court and a Liberian court."); Tr. at 29 (Mr. Gottlieb: "Mr. Lohman was retained initially by someone who—who had a sincere belie[f] that—that they had not received justice in the United States."); Tr. at 36 (Donald Hawthorne [Counsel for CWW]: "He was aware of the U.S. court order, he just felt like he could ignore it.").)  Furthermore, in June 2003, Lohman wrote a time entry in a bill to AJA that read "Review received correspondence re US anti-suit." (Doc. Nos. 437, 438, Ex. 46.)  The undisputed facts thus amply indicate that Lohman was fully aware of the 2001 Anti-Suit Injunction and chose to defy it.

It is also undisputed that like Lohman, Kenney and Kelleher knew of the Injunction and the potential consequences of violating it when they "willingly interjected" themselves into this matter.   (Doc. No. 470, Tr. at 7-9, 15 (Mr. Miller: "[Kenney] was aware of the order certainly.").)  Indeed, Kenney was recruited to help enforce the Liberian Judgment and violate the Injunction.  (Doc. No. 428 at 12 ("Kenney was retained to advise on collection of the 2000 Liberian judgment. AJA was referred to Kenney by Samuel Lohman, another attorney who had been retained by AJA.").)  Kenney, in turn, provided Kelleher with information about the Anti-Suit Injunction.  (Doc. No. 437, 438, Ex. 11 at Interrog. 1(g).)

Plainly, all Respondents well understood that they were violating the 2001 Injunction and that this could lead to a contempt citation.  In a 2008 report to CCI, Lohman and Kenney wrote:

> The AJA Judgment has a number of serious problems facing it. These problems can be captured by the following: (a) Contempt.  If the appeals in Pennsylvania are lost, any member of the legal team (or ultimately an investor) in CCI could be sanctioned for disobedience of the 2001 Anti-enforcement of Foreign Money Judgement Injunction of the US District Court of Philadelphia.

(Doc. Nos. 437, 438, Ex. 1 at 20.)   In thus knowingly defying this Court, the individual Respondents cannot reasonably contend that they failed to "understand that the injunction barred

[their conduct]" or that they acted on the "belief that they were on solid legal footing."  (Doc. No. 470, Tr. at 15, 29; Doc. No. 428 at 26; Doc. No. 429 at 10 n.4; Doc. No. 432 at 3.)

In any event, such "good intentions" do not excuse contempt.  See Robin Woods Inc., 28 F.3d at 399; Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76 (1st Cir. 2002) (like Parties, non-parties cannot defeat contempt through good faith defense). If Respondents actually could not understand the exceedingly clear scope of Judge O'Neill's Injunction, they certainly could have requested clarification.  See Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 15 (1945) ("If defendants enter upon transactions which raise doubts as to the applicability of the injunction, they may petition the court granting it for a modification or construction of the order . . . we think courts would not be apt to withhold a clarification.").  They did not do so. Rather, with full understanding of the Injunction and the consequences of defying it, Respondents acted at their peril.

In sum, CWW has proven, with clear and convincing evidence, that Respondents acted in contempt of this Court's 2001 Injunction when they knowingly violated the exceedingly clear prohibition against taking "**any action** to enforce in any jurisdiction the Liberian judgment." Younis Bros., 167 F. Supp. 2d at 747 (emphasis added).

### 4.  *This Court Has Subject Matter Jurisdiction Over Respondents*

Respondents argue that Judge O'Neill lacked subject matter jurisdiction in 2001 to adjudicate CWW's initial Injunction Motion.  (Doc. No. 428 at 31 ("CIGNA's 2001 injunction motion was a new proceeding requiring subject-matter jurisdiction to be re-established."); see, e.g., Peacock v. Thomas, 516 U.S. 349 (1996); Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 461 (1980); Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, 551 F.3d 812 (8th Cir. 2009). It relatedly argues that because ACE (a foreign corporation that agreed in 1999 to

indemnify CWW) was the real party in interest, the court lacked diversity jurisdiction to enter the Anti-Suit Injunction.  (Doc. No. 428 at 34-36; Doc. No. 448 at 1.)  Respondents further argue that this Court also lacks subject matter jurisdiction to determine whether Respondents have violated that same Injunction.

Had this been so, however, the Third Circuit could not have considered the merits of Judge Fullam's 2009 contempt ruling.  Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists . . . . [W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety.").  The Third Circuit addressed Judge Fullam's January 2009 ruling on the merits, however.  Abi Jaoudi, 391 F. App'x at 177 ("We . . . thus have jurisdiction to consider appellants' challenge to the District Court's FSIA ruling.").  Respondents' belated attack on subject matter jurisdiction thus appears to have already been rejected.

In any event, Judge O'Neill correctly determined that he had subject matter jurisdiction to adjudicate the Injunction Motion based on the Court's inherent power to enforce its decisions.  Younis Bros., 167 F. Supp. 2d at 744 ("And where a court may prescribe, it may also enforce."); see also In re Linerboard Antitrust Litig., 361 F. App'x 392, 396 (3d Cir. 2010) (pursuant to All Writs Act, 28 U.S.C. § 1651(a), Courts have power to enter and enforce injunctions even over non-parties "who are in a position to frustrate the implementation of a court order or the proper administration of justice" (citations omitted)); Gambone v. Lite Rock Drywall, 288 F. App'x 9, 12 (3d Cir. 2008) ("[A]ncillary jurisdiction lets prevailing litigants go to the District Court that entered judgment for help in resolving matters related to its enforcement."); Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111 (2d Cir. 2007) ("[T]he

District Court retained—and retains—continuing jurisdiction to maintain the anti-foreign-suit injunction."); see also Autotech Techs. LP v. Integral Research & Dev. Corp., 499 F.3d 737, 744 (7th Cir. 2007) ("Once a court is entitled to exercise subject matter jurisdiction over the suit, it has the full panoply of powers necessary to bring that suit to resolution and to enforce whatever judgments it has entered.").  Because Judge O'Neill correctly determined that he had inherent authority to enforce his prior Judgment, it was not necessary to re-establish subject-matter jurisdiction during the Injunction proceedings.

Finally, notwithstanding the indemnification arrangement, CWW, a domestic corporation, has remained a party in interest throughout these proceedings for both diversity and Rule 17 purposes.  See Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 463 n.9 (1980) ("There is a 'rough symmetry' between the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy."); Fed. R. Civ. P. 17(a)(1).  In determining whether complete diversity exists, a court generally "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."  Id. at 461.  That a party is indemnified, however, does not render it nominal.  Mundle v. Linde, LLC, 2011 WL 1526965, at *2-3 (E.D. Mo. 2011); Patrick v. Porter-Cable Corp., 2010 WL 2574121, at *5 (D. Conn. Apr. 1, 2010) (same and noting that an opposite ruling is "contrary to conclusions of the overwhelming majority of courts in this and other circuits").  Moreover, "[t]here may be multiple real parties in interest for a given claim, and if the plaintiffs are real parties in interest, Rule 17(a) does not require the addition of other parties also fitting that description."  HB Gen. Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1196 (3d Cir. 1996).

CWW was obviously a real party in interest both to the original coverage suit and again when the 2001 Injunction issued; it certainly maintains an interest in the enforceability of Judge O'Neill's Order.  Roe v. Operation Rescue, 919 F.2d 857, 874 (3d Cir. 1990) ("[P]roceedings for civil contempt are between the original parties.").  ACE's own interest in the outcome of this litigation thus does not eliminate CWW's interest—which includes mitigating indemnifiable losses—and does not defeat subject matter jurisdiction to adjudicate this Contempt Motion.

### 5.  *Respondents Are Not Protected by Sovereign Immunity*

Having recruited the Liberian Receivers to further their own private interests, Respondents now claim as their own any sovereign immunity to which the Receivers may be entitled.  (Doc. No. 428 at 38; Doc. No. 429 at 19; Doc. No. 432 at 3.)  The claim is especially dubious, given Respondents' repeated refusals to provide discovery to support their immunity invocation.  Moreover, given that Kelleher has never claimed to represent or otherwise act as an agent of any Liberian official, his claim is particularly confounding.

In any event, Respondents are not entitled to derivative sovereign immunity.  Their actions in resisting the Injunction—by, *inter alia*, recruiting investors, developing funding vehicles, and demanding payment on the Liberian Judgment—largely predate the appointment of the Receiver.  Senesie was not appointed until April 2007 at the urging of Lohman and Kenney.  Lohman represented AJA from 2003 to 2007, and Kenney from 2003 until 2006.  Similarly, Kelleher's involvement with CCI began at least as early as February 2006, a year before the Receiver's appointment.  (Doc. Nos. 437, 438, Ex. 11 at Interrog. 1(g).)  The suggestion that these acts—which were intended exclusively to promote private interests—are retroactively cloaked with sovereign immunity once a Receiver was appointed, would have the tail wag the dog.  Accordingly, I will reject Respondents' suggestion of retroactive immunity.  This ruling

comports with the Department of State's guidance that "Lohman is not entitled to immunity for actions he took while representing the AJA." (Doc. No. 428, Ex. F at 15); Republic of Austria v. Altmann, 541 U.S. 677, 702 (2004) ("[When] the State Department choose[s] to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.").

Respondents also argue that they are entitled to derivative sovereign immunity for actions they took after the Receiver's appointment. (Doc. No. 428 at 38-42; Doc. No. 429 at 19-21.) Yet, Respondents do not explain how the actions they took after the Receiver's 2007 appointment are bathed in governmental protection from suit, when the same pre-appointment actions—all intended to advance private interests—are not. For this reason, even without reaching the question of the Receiver's immunity, Respondents are not entitled to derivative immunity to the extent they continued to act on behalf of private parties (AJA and CCI) after 2007. I will nonetheless discuss the grounds upon which Respondents appear to base their immunity claim.

The Third Circuit has already ruled that the Foreign Sovereign Immunities Act forecloses Respondents' individual claims of statutory immunity. See Abi Jaoudi, 391 F. App'x at 178 ("In Samantar, the Supreme Court endorsed the minority rule, concluding that 'the FSIA does not govern [an individual's] claim of immunity.' This holding forecloses Senesie and Lohman's argument on appeal. Nonetheless, as the Supreme Court suggested alternative paths to immunity in Samantar, we vacate the District Court's order and remand for further proceedings to allow the parties to address those possible options."). I thus need address only whether Respondents are entitled to any "alternative paths to immunity." They are not.

32

The Third Circuit identified three possible bases for sovereign immunity.  For instance, parties could seek common law immunity based on an Executive Branch suggestion of immunity.  See id. at 179  (common law immunity predates and survives FSIA and describing process of seeking a State Department "suggestion of immunity" (citing Samantar, 560 U.S. at 311)); Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486 (1983) (Before FSIA's enactment, courts "deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities").

Significantly, the State Department, in its "Statement of Interest" here, would not opine directly on whether the Receivers are entitled to sovereign immunity, instead leaving that task to the courts.  (Doc. No. 428, Ex. F at 14 ("[B]ased on the current record, the United States is declining to take a position on whether, under Liberian law, the acts at issue were taken within Senesie's and Sesay's official capacities leaving that determination to the Court."); see Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes, 336 F.2d 354, 360 (2d Cir. 1964) ("Since the State Department's failure or refusal to suggest immunity is significant, we are disposed to deny a claim of sovereign immunity that has not been 'recognized and allowed' by the State Department unless it is plain that the activity in question falls within one of the categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive." (emphasis added)).  Rather, the State Department has advised as follows:

> [T]he United States suggests that Respondents Senesie and Sesay are immune from suit to the extent the Court finds that, under Liberian law, they acted in their official capacities when they took the acts that are the basis for Defendant's [CWW's] contempt motion against them.  Conversely, Senesie and Sesay are not entitled to immunity to the extent the Court finds that, under Liberian Law, these acts were taken solely in their capacities as representatives of the estate and thus outside their official capacities. . . . To the extent that claims against Lohman arises from his conduct on behalf of Senesie, any immunity to which Lohman is

> entitled derives from and cannot exceed the immunity to which Senesie is entitled
> for such acts as were taken in his official capacity.

(Doc. No. 428, Ex. F at 14-15.)

In accordance with this advice, I must first determine whether the Receivers took their challenged actions in their official capacities. I will assume that for the purposes of this analysis, had Kelleher and Kenney been named as Respondents in the November 2008 Contempt Motion, the State Department would have evaluated them as it evaluated Lohman.

Once again, the Receivers' (and Respondents') refusal to provide jurisdictional discovery has certainly encumbered my efforts. Without subjecting themselves or their allegations to any investigation, Respondents nonetheless offer the following untested "evidence" to support their immunity argument: 1) a 2012 Liberian Civil Law Court opinion; 2) a Liberian embassy report; and 3) the opinion of their Liberian law expert. (Doc. No. 233, Ex. A; Doc No. 422, Ex. 54; Doc. No. 428, Ex. G.)

Relying upon these materials, Respondents contend principally that under Liberian law, Senesie's and Sesay's actions were necessarily official because only "the Insurance Commissioner may be appointed Receiver." (Doc. No. 428 at 41; Doc. No. 429 at 19-21.) Once again, Respondents have not allowed this dubious suggestion to be tested through discovery. Assuming this statement is true, it is beside the point: Respondents ignore that the critical inquiry here is not who may be appointed by the sovereign, but whether the appointee acts on the sovereign's behalf for a public purpose. See Heaney v. Gov't of Spain, 445 F.2d 501, 503 (2d Cir. 1971) ("[T]he State Department has explicitly indicated that its policy is generally predicated on a 'restrictive' theory of sovereign immunity—'recognizing immunity for a foreign state's public or sovereign acts (jure imperii) but denying immunity to a foreign state's private or commercial acts (jure gestionis).'"); see also Verlinden, 461 U.S. at 487 (common law sovereign

immunity was "confined to suits involving the foreign sovereign's public acts, and [did] not extend to cases arising out of a foreign state's strictly commercial acts").  At common law, sovereign immunity thus typically attached to foreign officers only for a narrow category of acts "about which sovereigns have traditionally been quite sensitive": "(1) internal administrative acts, such as expulsion of an alien[;] (2) legislative acts, such as nationalization[;] (3) acts concerning the armed forces[;] (4) acts concerning diplomatic activity[; and] (5) public loans." Heaney, 445 F.2d at 503.

The Receivers' actions on behalf of CWW's "Liberian Branch" (a wholly private entity), are plainly not those about which "sovereigns have traditionally been quite sensitive."  Id.  To the contrary, as Respondents' own expert recognizes, once an Insurance Commissioner is appointed Receiver, he becomes the "successor of such alien company's Liberian branch and business."  (Doc. Nos. 437, 438, Ex. 54 ¶ 27.)  Accordingly, insofar as the Receiver acknowledged the Liberian Judgment as a debt of CWW and brought suit in CWW's name to collect on that debt, he acted for a distinctly private, commercial purpose.  See Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 613-14 (1992) ("[T]he restrictive theory of foreign sovereign immunity would not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation."); In re Nakash, 190 B.R. 763, 769 (Bankr. S.D.N.Y. 1996) ("In the role of liquidator, the Receiver [a representative of the Israeli Government] has sought to enforce the Judgment he obtained against the Debtor . . . Because the Receiver . . . acted in a commercial capacity . . . he should not be afforded the blind eye which the Act of State Doctrine affords."); see also Cole v. Heidtman (S.D.N.Y. 1968) (sovereign immunity does not attach when officials' actions were of a private nature) (cited in Sovereign Immunity Decisions of the Department of State, May 1952 to January 1977, 1977 Digest).  Because CWW's

"Liberian Branch," as a private actor, could have sued its indemnitor in its own name for breach of contract, it is absurd to suggest that the court's appointment of a receiver to bring that same action cloaks Senesie or Sesay with sovereign immunity.

This conclusion is consistent with abundant authority that a receiver—even one who also holds a government post—acting as a liquidator on behalf of a private corporation does not automatically become a sovereign entity. See N. Carolina v. Blackburn, 492 F. Supp. 2d 525, 534 (E.D.N.C. 2007) ("[T]he Commissioner in his capacity as the liquidator of [a private corporation] is not the alter ego of North Carolina."); Dinallo v. DiNapoli, 877 N.E.2d 643, 648 (N.Y. 2007) ("[T]he Superintendent as liquidator occupies a legal status that is 'separate and distinct from the Superintendent of Insurance as the public official charged with regulating the industry generally.'"); The S. Cross, 120 F.2d 466, 468 (2d Cir. 1941) ("[A] receiver appointed on . . . behalf [of the United States] can stand no higher than a receiver appointed in any foreclosure suit between private litigants. He is an agent of the court, not of the Maritime Commission or the United States. The fact that libellant's request for the receivership was granted in order to promote some governmental policy respecting the merchant marine, does not convert the receiver into a governmental instrumentality."); 65 Am. Jur. 2d Receivers § 116 (2016) ("Because a receiver steps into the shoes of the represented entity, the receiver has no rights separate from the represented entity.").

In sum, a receiver proceeding on behalf of a private entity acts independently of the Government position he might also hold. Accordingly, the Receivers here have acted "in their capacities as representatives of the estate and thus outside their official capacities." (Doc. No. 428, Ex. F at 15.)

Other undisputed facts also support this conclusion.  For instance, in its Diplomatic Note to the State Department, Liberia conceded that it is not the real party in interest here.  (Doc. Nos. 437, 438, Ex. 51 ("On the facts of this case, the Republic of Liberia confirms that it is not the real party in interest in the Proceedings. Rather, one of its former State officials and his current successor in that office (and one of their agents) have been sued personally and in respect of activities undertaken by them in furtherance of their Liberian statutory and Court-mandated duties.").)   This renunciation further forecloses any claim by the Receiver to sovereign immunity. Cf. Arcaya v. Paez, 145 F. Supp. 464, 470 (S.D.N.Y. 1956) (for diplomatic immunity to apply, a person's "diplomatic character" must be "recognized by the government within whose dominions he assumes to exercise" (discussing The Sao Vicente, 260 U.S. 151, 155 (1922))), aff'd, 244 F.2d 958 (2d Cir. 1957).

That the Receivers' actions were directed by Respondents and the entities Respondents controlled further confirms that the Receivers were not acting on behalf of a sovereign.  See Velasco v. Gov't Of Indon., 370 F.3d 392, 399 (4th Cir. 2004) ("[T]he act of an agent beyond what he is legally empowered to do is not binding upon the government."); Phaneuf v. Republic of Indon., 106 F.3d 302, 306 (9th Cir. 1997) ("[A]nything the sovereign has not empowered the official to do" is "beyond the scope of the official's authority." (citing In re Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493, 497 (9th Cir. 1992)).  As I have found, the uncontradicted evidence shows: 1) the Receiver entered into agreements with CCI limiting the Receiver's settlement authority; 2) the only "debts" the Receiver recognized were those of AJA and the G-22; and 3) Kelleher, CCI, and Echemus were the exclusive source of funding for the Receiver's efforts and would, in turn, obtain the great bulk of any benefit.  (Doc. Nos. 437, 438, Ex. 1; Ex. 9 ¶ 287; Ex. 10 ¶ 29.)  Given that these private parties are the only entities that could

37

actually benefit from the Receivers' enforcement efforts on behalf of a sham entity (the non-existent CWW "Liberian Branch"), it is preposterous to suggest that the Receivers were actually acting on behalf of the nation of Liberia.

Finally, Lohman's U.S. citizenship precludes him from claiming derivative foreign sovereign immunity.  A contrary ruling would allow any foreign-based U.S. citizen to evade compliance with domestic laws and court orders simply by alleging that he is a foreign government's agent.  See Restatement (Third) of Foreign Relations § 402 (1987) ("[A] state has jurisdiction to prescribe law with respect to . . . the activities, interests, status, or relations of its national outside as well as within its territory."); cf. Yousuf v. Samantar, 699 F.3d 763, 777 (4th Cir. 2012) (U.S. residents who enjoy the protections of U.S. law "ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents").

This conclusion is also consistent with authority suggesting that (statutory) foreign sovereign immunity does not extend to U.S. citizens serving in non-official roles in foreign governments.  See H.R. Rep. No. 94-1487, at 16, reprinted in 1976 U.S.C.C.A.N. 6615 (1976) (FSIA immunity generally does not extend to U.S. citizens in non-diplomatic, civil service, or military positions—i.e., in positions which are non-public and non-governmental in nature); cf. El-Hadad v. U.A.E., 216 F.3d 29, 33 (D.C. Cir. 2000); Holden v. Canadian Consulate, 92 F.3d 918, 922 (9th Cir. 1996) (U.S. citizen employed by Canadian consulate was not entitled to sovereign immunity because, inter alia, her work was "regularly done by private persons" and she "could not speak for the government"); Segni v. Commercial Office of Spain, 650 F. Supp. 1042, 1045 (N.D. Ill. 1986), aff'd, 835 F.2d 160 (7th Cir. 1987).  Lohman thus may not, in any circumstances, claim derivative sovereign immunity for his actions to enforce the Liberian Judgment.

In sum, because the Receivers are not entitled to sovereign immunity for their challenged actions, I will reject Respondents' derivative sovereign immunity defense.

### 6. *Lohman Is in Contempt of My Discovery Orders*

Lohman's repeated failure to provide discovery to CWW also warrants sanctions. Fed. R. Civ. P. 37; see Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 708-09 (1982) (upholding Rule 37 sanctions—i.e., "an application of a legal presumption to the issue of personal jurisdiction"—against foreign companies for failure to comply with jurisdictional discovery even where respondents claimed a jurisdictional defense). From 2010 through early 2012, Lohman repeatedly ignored my Orders requiring him to provide full and complete responses to CWW's interrogatories and document production requests, and to submit for a deposition. Lohman has continually refused to cooperate with jurisdictional discovery, arguing disingenuously that Swiss criminal law prevents him from appearing and that discovery requests must be made in compliance with the Hague Convention. (Doc. No. 304.) I have described how Lohman—through his counsel—reneged on his agreements even to explain by deposition or through documents his foreign law concerns. CWW asks me to hold Lohman in contempt, refer him to Oregon disciplinary authorities, and impose any other necessary sanction. (Doc. Nos. 437, 438 at 73; Doc. No. 470, Tr. at 36-37 (Mr. Hawthorne: "Mr. Lohman['s] . . . role here . . . is simply particularly shocking as a U.S. citizen . . . . as a member of the Oregon bar. He has directly violated four orders of this Court, four orders to produce discovery, three orders to sit . . . for a deposition . . . .").)

I have repeatedly ruled that foreign statutes and conventions do not limit discovery in this case. (Doc. No. 413 at 3, 12; Doc. No. 417 at 1; Doc. No. 452 at 6); see also In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 303-04 (3d Cir. 2004) (foreign statutes that limit

discovery "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute" (quoting Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa, 482 U.S. 522, 544-45 n.29 (1987))); cf. Shawmut Boston Int'l Banking Corp. v. Duque-Pena, 767 F.2d 1504, 1507 (11th Cir. 1985) (rejecting defendant's attempt to claim immunity based on Colombian law where he willfully refused to submit to a deposition).

Aside from once again insisting that Swiss law prevents disclosure—something he refused to explain by deposition, interrogatories, or document production—Lohman offers no good reason to alter these rulings. (Doc. No. 429 at 24-26.) Quite to the contrary, he continues to suggest (incredibly) that he acted in "good faith." Because Lohman has continually evaded and obstructed jurisdictional and immunity discovery, while at the same time raising jurisdictional and immunity defenses, Lohman (and the other Respondents) has obviously sought to prevent this litigation from proceeding. (Doc. No. 470, Tr. at 38 (Mr. Hawthorne: "Lohman could have come here. He certainly could have sat for a deposition and opened his mouth and said something without risking criminal consequences back in Switzerland. We had a fair amount of debate on this in the papers, most of which showed that his concerns were overblown and—and unfounded.").) In any event, unless Lohman afforded CWW reasonable discovery, the viability of those defenses cannot be presumed. See Fed. Ins. Co. v. Richard I. Rubin & Co., 12 F.3d 1270, 1284 n.11 (3d Cir. 1993) ("We agree with other courts of appeals that sovereign immunity is a 'critical preliminary determination' of subject matter jurisdiction for which the parties should be granted a fair opportunity to engage in jurisdictional discovery."); Aurelius Capital Master, Ltd. v. Republic of Arg., 589 F. App'x 16, 17 (2d Cir. 2014) (Argentina's "self-serving legal assertion of immunity does not entitle it to withhold otherwise discoverable

information" (internal quotations omitted)); <u>FG Hemisphere Assocs., LLC v. Dem. Rep. Congo</u>, 637 F.3d 373, 378 (D.C. Cir. 2011) (contempt sanction available against foreign sovereign for failure to comply with jurisdictional discovery); <u>Autotech Techs.</u>, 499 F.3d at 744 (same); <u>Velasco</u>, 370 F.3d at 398  ("Where the motion . . . is based on a claim of foreign sovereign immunity, . . . the court must engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case before trial.'").

Lohman's failure to comply with his discovery obligations has thus not only harmed CWW, but also hampered this Court's ability to determine even basic jurisdictional facts, triggering "the core justification for the contempt power" and meriting Rule 37 sanctions. <u>Bagwell</u>, 512 U.S. at 833.

Having aggressively obstructed these proceedings, Lohman (as well as Kenney and Kelleher) argue that "CWW's decision to 'defer holding [him] in contempt' for nearly three years is effectively a waiver of the right to pursue sanctions at this time."  (Doc. No. 429 at 22; Doc. No. 432 at 3; Doc. No. 448 at 3.)  It is difficult to believe that these contentions are made seriously in good faith.  (Doc. No. 470, Tr. at 36 (Mr. Hawthorne: "It took years because of Respondents['] conduct in hiding—hiding the trail, in concealing the identity [of the litigation funder]. And there's specific intent to conceal from a U.S. Court the identity of someone who had acted in contempt of a U.S. court order."); <u>see Harris</u>, 582 F.3d at 516 (noting that "orders of civil contempt can outlive the underlying proceeding," and emphasizing that the termination of the underlying proceeding need not render a contempt order moot); <u>cf. Reich</u>, 50 F.3d at 417 ("[N]o statute of limitations applies to civil contempt proceedings.").

Finally, given that Lohman is an attorney admitted to practice in the U.S., his behavior is particularly egregious, arguably amounting to professional misconduct and likely warranting a

41

referral to the applicable disciplinary authority.  <u>See, e.g.</u>, Restatement (Third) of the Law Governing Lawyers § 94 (2000) ("[A] lawyer may not counsel or assist a client in conduct that the lawyer knows to be . . . in violation of a court order with the intent of facilitating or encouraging the conduct.").

Accordingly, I will find Lohman in contempt of my Orders of May 10, 2011, May 31, 2011, August 19, 2011, and March 21, 2012 Discovery Orders.  (Doc. Nos. 239, 246, 272, 302.) I will also ask CWW to address the appropriate manner of disciplinary referral.

### 7. *CWW Is Entitled to Damages*

CWW requests compensatory sanctions and asks me to impose joint and several liability for the costs and attorneys' fees incurred as a result of Respondents' contempt.  (Doc. Nos. 437, 438 at 71-72.)

I have broad discretion to fashion a remedy that will achieve full relief for an aggrieved petitioner.  <u>See</u> <u>Del. Cty. Intermediate Unit</u>, 318 F.3d at 554.  The relief in a civil contempt proceeding can take the form of an award of costs and attorney's fees, as well as damages not to exceed the actual damages that the petitioner incurred.  <u>See</u> <u>Quinter v. Volkswagen of Am.</u>, 676 F.2d 969, 975 (3d Cir. 1982).

I will request additional briefing as to the amount of damages.  <u>Sovereign Bank v. Gallco Enters., Inc.</u>, No. CIV.A. 10-4648, 2011 WL 346597, at *5 (E.D. Pa. Feb. 4, 2011) ("[T]he Court shall defer assessing the amount of this sanction until after Plaintiff submits an affidavit providing support for the amount of attorneys' fees.").  Any supplemental briefing should be limited to the appropriate damage award and should not revisit the question of liability.

## IV.     Conclusion

In 1991, AJA availed itself of this Court's jurisdiction by filing a civil action in this District. After receiving a disappointing result, it found a more amenable jurisdiction, where it obtained a result more to its liking.  In the fourteen years that followed, AJA and those whom it recruited—Lohman, Kenney, and Kelleher—have made repeated efforts to contravene this Court's Judgment, nullify this Court's Injunction, and defy this Court's Orders.  Now invoking this Court's jurisdiction, now denying it; now proceeding under American law, now alleging that they cannot comply with it; now claiming immunity, now refusing to provide any supporting discovery, Respondents' outrageous behavior is an affront to the Courts of the United States.  Cf. Laker Airways, 731 F.2d at 939 ("[T]he violation of public policy vitiating comity is not that the evasion of United States . . . law might injure United States interests, but rather that United States judicial functions have been usurped, destroying the autonomy of the courts.").  Moreover, it has caused CWW to incur considerable expense and delay. By knowingly aiding and abetting a violation of Judge O'Neill's valid and unambiguous Injunction, the individual Respondents have indisputably subjected themselves to this Court's jurisdiction and are not immune from remedial sanctions this Court may impose.

Although their contumacious conduct in the Cayman Islands litigation appears to have ceased, Respondents may well decide to seek enforcement of the Liberian Judgment in yet another jurisdiction. Because contempt sanctions could deter such wrongful conduct and would compensate CWW for the costs it has incurred, a contempt citation is entirely proper. Accordingly, I find each Respondent in contempt and will order supplemental briefing as to the appropriate remedy.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

Paul S. Diamond, J.